# THE UNITED STATES COURT OF FEDERAL CLAIMS

## PRO SE PETITIONER'S BRIEF IN SUPPORT OF REQUEST FOR RESTITUTION

**PRO SE PETITIONER:**

Jerroll M. Sanders

Descendant of a U.S. Non-Hispanic Chattel Slave

15 Riverwood Estates Blvd

Florissant, MO 63031

202-499-8286

jerrollms@yahoo.com

**RESPONDENT:**

Office of the Attorney General

U.S. Department of Justice

950 Pennsylvania Avenue, NW

Washington, D.C. 20530-0001

Title: PRO SE PETITIONER'S BRIEF IN SUPPORT OF REQUEST FOR RESTITUTION

Case No.: 24-1301c (Judge Roumel)

SECOND AMENDED COMPLAINT

## PURPOSE OF THE AMENDED COMPLAINT

The petitioner respectfully moves this Court for leave to amend her *Brief in Support of Request for Restitution* pursuant to Rule 15(a) of the Federal Rules of Civil Procedure (FRCP), as applicable in this Court. The proposed amendment serves the interest of justice by allowing for the inclusion of necessary facts, citations and claims that will enable a fair and comprehensive adjudication of the issues at hand."

## I. INTRODUCTION

This brief is submitted to the Court on behalf of Pro Se Petitioner Jerroll M. Sanders, a descendant of non-Hispanic U.S. chattel slaves. Petitioner seeks restitution from the United States Government based upon an unjust enrichment claim that asserts her enslaved ancestors—non-Hispanic U.S. chattel slaves—enriched the U.S. economy as evidenced by the trajectory of the United States annual GDP from 1619 to 2024. Petitioner asserts that she is entitled to a pro rata share of total restitution due non-Hispanic U.S. chattel slaves in the amount of 53,871,359,196,130 (Fifty-three trillion, eight hundred seventy-one billion, three hundred fifty-nine million, one hundred ninety-six thousand, one hundred thirty dollars) plus $2.00. The petitioner says her pro-rata share of restitution due

© 2024. Jerroll M. Sanders. All Rights Reserved. 1

is $1,077,427,183.92 (One billion, seventy-seven million, four hundred twenty-seven thousand, one hundred eighty-three dollars). She is asking the court to invoke its powers to resolve this claim.

## II. JURISDICTION

Petitioner, Jerroll M. Sanders, brings this action against the United States under the Tucker Act, 28 U.S.C. § 1491, for unjust enrichment. Petitioner will demonstrate that: 1) Her ancestors conferred perpetual financial benefits to the U.S. Government, as measured by Gross Domestic Product (GDP); 2) The U.S. Government has ongoing knowledge of the benefits received; 3) The U.S. Government accepted and continues to retain those benefits; and 4) It would be unjust for the U.S. Government to retain those benefits without providing equivalent compensation for their value.

The U.S. Court of Federal Claims has jurisdiction over unjust enrichment claims as part of its authority to adjudicate legal claims for monetary damages, including those seeking restitution for unjust enrichment in amounts exceeding $10,000. *The Tucker Act allows the Court of Federal Claims to hear cases involving **monetary damages** based on contracts, takings, and certain non-contractual claims, **including those grounded in principles of unjust enrichment.***

For a claim of unjust enrichment to be heard, it must demonstrate that the government has received benefit at the claimant's expense without a legal justification for retaining that benefit. While unjust enrichment does not fit neatly into traditional tort or contract categories, it is recognized within the broader framework of claims for which the Tucker Act provides jurisdiction, particularly when a valid basis for compensation from the government is established.

## III. FACTUAL BACKGROUND

1. **Slavery in the United States:**

    - **Establishment and Endurance of Slavery:** From 1619 to 1865, chattel slavery was a foundational element of American society. Non-Hispanic U.S. chattel slaves were subjected to forced labor and extreme exploitation. The value provided by the enslaved accounted for the explosive increase of the Gross Domestic Product of the United States from 1619 to 2024.

    - **Constitutional and Legislative Endorsements:** The U.S. Constitution, adopted in 1787 and ratified in 1789, included provisions that endorsed and perpetuated non-Hispanic U.S. chattel slavery, such as the Three-Fifths Compromise and the Fugitive Slave Acts.

© 2024. Jerroll M. Sanders. All Rights Reserved. 2

- **Judicial Decisions:** Landmark decisions like the Dred Scott case of 1857, in which Chief Justice Roger B. Taney declared that the Black man had no rights that white men were bound to respect (*Dred Scott v. Sandford, 60 U.S. (19 How.) 393 (1857)*), further entrenched the institution of slavery as a cornerstone of the U.S. economy. The ruling not only dehumanized Blacks but also reinforced the legal framework supporting slavery.

**The United States—A True Criminal Enterprise:**

- **A Criminal Enterprise that Spanned the U.S.:** The U.S. Government operated a criminal (illegal) enterprise[1] known as U.S. chattel slavery from 1619 to 1865. The criminal institution of slavery benefited the entire U.S. Government, including in non-slave states. Officials overseeing the U.S. Government established a defined (ascertainable) structure authorized to commit unlawful acts for financial gain. Their actions amounted to far more than a mere pattern of criminal activity; the structure of the enterprise was designed to ensure continuity of existence and a criminal purpose far beyond the scope of individual acts. Numerous books, U.S. documents, and federal institutions, including the African American History Museum in Washington, D.C., attest to the barbaric existence imposed upon non-Hispanic U.S. chattel slaves for financial gain. Offenses included:

  - Forced labor
  - Human bondage (internment)
  - Lifetime incarceration
  - Parental/child separation
  - Forced marital separation
  - Theft of intellectual property
  - Child and human trafficking
  - Child molestation
  - Rape

---

[1] DOJ defines a criminal enterprise as "A common reference is found in the **Racketeer Influenced and Corrupt Organizations Act (RICO)**, 18 U.S.C. § 1961, which defines a "criminal enterprise" as any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity."

© 2024. Jerroll M. Sanders. All Rights Reserved. 3

- Sex trafficking
- Human breeding
- Emotional duress and abuse
- Physical abuse
- Mutilation and dismemberment
- Murder
- Denial of personal agency

2. **Economic Impact of Slavery:**
    - **Economic Contributions:** The labor non-Hispanic U.S. chattel slaves provided was instrumental in the economic development of the United States and its continued economic affluence as revealed by the Nation's burgeoning GDP. The U.S. Government—with slave owners—exploited the intellectual and physical capacity of non-Hispanic U.S. chattel slaves for over 200 years, 24 hours a day, seven days a week, but failed to provide equal benefits in return. Many sources substantiate Petitioners claim that non-Hispanic U.S. chattel slaves provided the foundation for this Nation's economic prosperity as evidenced by GDP.[2]

---

[2] **"Time on the Cross" by Robert Fogel and Stanley Engerman**: This influential book argues that slavery was economically efficient and that the labor of enslaved people contributed significantly to the wealth of the United States.
**"The Half Has Never Been Told: Slavery and the Making of American Capitalism" by Edward E. Baptist**: Baptist presents a detailed account of how slavery was integral to the development of the American economy and how it contributed to the rise of capitalism in the U.S.
**"Slavery and Capitalism" by the American Economic Association**: Various economic studies published in this journal have explored the economic impacts of slavery, highlighting how slave labor was a foundation for many sectors of the economy.
**"Economic History of the United States" by various authors**: Many textbooks on U.S. economic history cover the role of slavery in economic development, particularly in relation to agriculture, trade, and industrialization.
**The work of historians like Eric Foner and W.E.B. Du Bois**: Both have explored the economic implications of slavery in their writings, emphasizing its foundational role in shaping American economic structures.
**Reports by the U.S. Census Bureau and other historical economic analyses**: These often contain data that illustrate the economic contributions of slave labor to the overall economy.
**Research from the National Park Service and historical sites**: These often include interpretations of how slave labor contributed to specific industries, such as cotton and tobacco, which were crucial to the economy.

© 2024. Jerroll M. Sanders. All Rights Reserved. 4

- **Unjust Enrichment:** The exploitation of the petitioner's ancestors—non-Hispanic U.S. chattel slaves—fueled agricultural output and was integral to the nation's economic prosperity and global standing. The U.S. government benefited significantly through various economic channels from its role in instituting and preserving chattel slavery. U.S. chattel slaves cultivated lucrative cash crops such as cotton, tobacco, and sugar, while also performing countless other activities that underpinned the U.S. economy. The labor of the enslaved contributed to the nation's rapidly increasing Gross Domestic Product (GDP), leading to higher tax revenues from corporate profits and consumer spending, which enabled greater expenditures on public services and infrastructure projects, including railroads and ports. Additionally, the economic benefits derived from slavery exponentially accelerated productivity and stability, bolstered financial markets, and contributed to lower borrowing costs for the U.S. government. The advantages of slavery permeated the entire U.S. economy, enhancing the country's global trade position, geopolitical influence, and political power. Non-Hispanic U.S. chattel slaves are fundamentally responsible for the wealth of the U.S. economy.

3. IV. LEGAL ARGUMENT

**Unjust Enrichment and Restitution:**

- **Legal Basis for Unjust Enrichment Claim:** Unjust enrichment is a legal claim remedied by restitution of equal value.

- **The Court's Power to Fashion a Remedy Unjust Enrichment:** To establish a claim for unjust enrichment resulting from non-Hispanic U.S. chattel slavery, Petitioner will prove:
    - The defendant (U.S. Government) received a benefit.
    - The benefit was obtained at the expense of the petitioner's ancestor(s) (non-Hispanic U.S. chattel slave(s)).
    - Restitution is necessary to restore fairness and address unjust enrichment.

- **Quasi-Contract/Implied-in-Law Contracts:** Petitioner does not assert that the U.S. Court of Federal Claims has jurisdiction over quasi-contract claims as distinct legal claims, given that a quasi-contract is not a formal contract. Rather, petitioner seeks to invoke the Court's authority under the Tucker Act,

© 2024. Jerroll M. Sanders. All Rights Reserved. 5

28 U.S.C. § 1491, to adjudicate legal claims for monetary damages, including those seeking restitution for unjust enrichment in amounts exceeding $10,000. The Court is authorized to adjudicate claims related to various types of contracts, including fixed-price contracts, cost-reimbursement contracts, time-and-materials contracts, as well as claims grounded in the principles of unjust enrichment (*Fisher v. United States*). Although quasi-contractual claims are not formal contracts, the Court can address petitioner's claim against the U.S. Government by recognizing the existence of an implied-in-law contract (quasi-contract) between petitioner and defendant, thereby awarding restitution equal to the value of the unjust enrichment. (*Cienega Gardens v. United States* 331 F.3d 1319 (Fed. Cir. 2003), *Tucker v. United States*, 24 Cl. Ct. 536 (1991)).

- **No Mutual Assent:** Unjust enrichment claims do not involve formal contracts, which are required under the Contract Disputes Act (CDA). Unlike traditional contracts, implied-in-law or quasi-contracts arise from the Court's recognition of a legal obligation, thus eliminating the need for mutual agreement between the parties. *Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003)*

- **Continued Impact/Ongoing Harm:** The economic benefits derived from U.S. chattel slavery continue to unjustly enrich the U.S. economy today. Providing restitution for unjust enrichment due to the GDP generated by the U.S. Government's criminal enterprise of chattel slavery from 1619 to 2024 will help ameliorate the ongoing harm.

- **No Statute of Limitations:** There is no statute of limitations barring claims for restitution arising from ongoing harm. The nature of the harm and the unjust enrichment the U.S. economy continues to reap from non-Hispanic U.S. chattel slavery justifies extending Petitioner's restitution claim beyond traditional time limits.

- **All Economic Activity Deemed Fruit from a Poisoned Tree.** The economic impact of slavery extended to every corner of the U.S. economy and fueled the economy nationwide, including in free states. Pursuant to the legal concept known as "fruit from a poisoned tree," the entire GDP of the United States from 1619 to 1937, as well as a share of GDP for each year from 1938 to 2023 is the value of unjust enrichment. The value will be increased upon a determination of 2024 U.S. GDP.

© 2024. Jerroll M. Sanders. All Rights Reserved. 6

1. **Uncompensated Harm (Restitution) for Criminal Acts:**
   - **Restitution for Inalienable Violations Not Time-Barred:** U.S. Government officials—acting within the scope of their employment—knowingly and intentionally violated the inalienable rights of non-Hispanic U.S. chattel slaves by confining them within a system that allowed and encouraged repeated and heinous violations of their rights for financial gain.

2. **Historical Precedent and Executive Action:**
   - **Precedent for Government Compensation:** Historical examples demonstrate that the U.S. Government has previously acknowledged and compensated for historical injustices through the U.S. Department of Justice Judgment Fund (e.g., Japanese American internment, Native American trust fund mismanagement, the U.S. government-established Holocaust Victims' Fund and use of the Judgment Fund to address specific claims and needs of Holocaust survivors.

## IV. CALCULATION OF RESTITUTION

1. **Methodology for GDP Calculation:**
   - **GDP from 1619 to 1865:** Calculated the economic benefits derived from slavery during this period by estimating the GDP impact using historical economic data and adjusting for a 3% annual growth rate.
   - **Residual GDP from 1866 to 1937:** Determined the economic benefits from slavery's residual effects after the Civil War until the 1937—the year U.S. cotton ceased to dominate the worldwide economy.
   - **Additional GDP from 1938 to 2023:** Calculated the ongoing economic benefits and unjust enrichment from slavery continuing into 2023. currently valued at $2.00.

2. **Restitution Amounts:**
   - **Total GDP Calculation:**
     - 1619-1865 GDP: $5,179,123,428,131
     - 1866-1937 Residual GDP: $48,692,235,767,997
     - 1938-2023 Additional GDP: $800,251,439,638,378 (Currently calculated at $2.00, to be determined.)

© 2024. Jerroll M. Sanders. All Rights Reserved. 7

- - **Total Restitution Due:** $53,871,359,196,130 plus $2.00 (Amounts to be determined.)
  - **Pro Rata Distribution:** Based on an estimated 50 million descendants, the restitution amount per descendant is approximately $1,077,427,183.92.

## VI. CONCLUSION

The Court of Federal Claims has jurisdiction to hear Petitioner's claim based on its authority to settle monetary claims against the U.S. Government, given that Petitioner can establish the following:

1. She is a descendant of non-Hispanic U.S. chattel slaves who were unjustly exploited to enrich the U.S. economy.

2. Petitioner's enslaved ancestors had no formal contract or agreement with the U.S. Government.

3. It would be inequitable for the U.S. Government to retain the benefits derived from Petitioner's ancestors without providing compensation of equivalent value.

4. Fairness compels the Court to exercise its equitable powers, as conferred by 28 U.S.C. § 1491, to remedy this longstanding injustice by awarding Petitioner her pro rata share of unjust enrichment, as outlined in this document.

Respectfully submitted,
Jerroll M. Sanders
Descendant of a Non-Hispanic U.S. Chattel Slave

*[signature]*

October 14, 2024

© 2024. Jerroll M. Sanders. All Rights Reserved. 8

## PROOF OF SERVICE

I, Jerroll Sanders, hereby certify under penalty of perjury that, on this 14th day of October 2024, I caused to be placed in the United States mail (first-class postage prepaid) a copy of of the following:

- Second Amended Complaint
- Motion for Leave to File Second Amended Complaint to the following:

DANIEL BERTONI

Trial Attorney

Commercial Litigation Branch

Civil Division

United States Department of Justice

PO Box 480

Ben Franklin Station

Washington, DC 20044

Telephone 202.880-0336

*[signature]*

© 2024. Jerroll M. Sanders. All Rights Reserved. 9

